AO 106 (Rev 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The residence located at 3720 Hammerwood Ct., Columbus<br>Ohio, 43219 including any person located therein who may<br>possess any form of digital device, and any digital devices<br>located therein/thereon | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   2:21-mj-339 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A INCORPORATED HEREIN BY REFERENCE**

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B INCORPORATED HEREIN BY REFERENCE**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Secs. 1956, 1343, and<br>21 U.S.C. Sec. 841 | Money laundering, wire fraud, and distribution or possession with intent to<br>distribute controlled substances |

The application is based on these facts:

**SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Samuel Chappell, TFO ATF**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____05/18/2021_____

_____
*Judge's signature*

City and state: Columbus, Ohio

**Chelsey M Vascura, U.S. Magistrate Judge**
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| IN THE MATTER OF THE SEARCH OF:<br>3720 HAMMERWOOD Ct., COLUMBUS<br>OHIO, 43219 | Case No. _____ |
| --- | --- |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Samuel Chappell being first duly sworn, hereby depose and state as follows:

## I.

## INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known 3720 Hammerwood Ct., Columbus, Ohio 43219, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Columbus Ohio Police Office (Columbus Police Department) currently assigned as a Task Force Officer (TFO) with the bureau of Alcohol Tobacco and Firearms (ATF). The Columbus Division of Police has employed me since 2007.  My responsibilities as a Task Force Officer include the investigation of violent criminal street gangs, narcotics traffickers, money launders, and firearm related crimes. I have participated in the execution of search warrants and arrests related to the above-referenced offenses. By virtue of my experience and training, I am familiar with money laundering techniques utilized by individuals involved in illegal activities, such a narcotics trafficking. I know that it is common for people involved in

this type of illegal activity to accumulate large sums of U.S., currency that they seek to launder in order to avoid detection of their illegal activities, and attempt to freely spend the cash without drawing law enforcement scrutiny. Throughout this affidavit, reference to "investigators" specifically refers to criminal investigators.

3.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on our ongoing investigation, your affiant believes probable cause exists to find that Larry ROWE, and others, are engaged in a large-scale conspiracy involving fraud, narcotics distribution, and money laundering, Your affiant further believes that evidence and instrumentalities of this activity can be found in the known residence of ROWE located at: 3720 Hammerwood Ct., Columbus, Ohio 43219.

II.

**PURPOSE OF AFFIDAVIT**

5.    This affidavit is submitted for the limited purpose of establishing probable cause in support of an application of a warrant to search the property located at 3720 Hammerwood Ct., Columbus, Ohio 43219 and therefore contains only a summary of the relevant facts. I have not included each and every fact that I, or others, have learned during the course of this investigation.   The information set forth in this affidavit is based on my own participation in the investigation, information I have received from other law enforcement officials and from my

2

other agents' analysis of documents and records relating to this investigation. As one of the case agents on this investigation, I am familiar with the investigative efforts of other agents/Columbus Police Detectives who have worked on this investigation. Further, I am familiar with the evidence gathered through the issuance of search warrants, subpoenas, and information provided to myself and other agents by cooperating individuals and informants.

6.      I believe there exists sufficient probable cause that evidence of the violations: 18 U.S.C. § 1031. Major fraud against the United States  18 U.S.C. § 1956 (a)(1)(A)(I) (Laundering of monetary instruments with the intent to promote the carrying on of the specified unlawful activity) 18 U.S.C. § 1956 (a)(1)(B)(i)(Laundering of monetary instruments with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity)  and 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance)  exists and can be found at the premises.

## III.

## APPLICABLE STATUTES AND DEFINITIONS

7.      Title 18, United States Code, Section 1031 makes it a federal crime for any person to knowingly execute, or attempts to execute, any scheme or artifice with the intent to defraud the United States; or to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

3

8.     Title 18, United States Code, Section 1956 makes it a federal crime for any person, knowing that property involved in a financial transaction represents proceeds of unlawful activity, to conduct or attempt to conduct that financial transaction involving the proceeds of the unlawful activity, either A) with the intent to promote or carry on the unlawful activity or intent to violate section 7201 or 7206 of the Internal Revenue Code; or B) knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity or to avoid a transaction reporting requirement under state or federal law.

9.     Title 21, United States Code, Section 841 makes it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance.  Subsection (b) of this section makes cocaine, cocaine base, heroin, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, and any of their isomers controlled substances.  Title 21, United States Code, Section 846, makes it a crime for any person to attempt or conspire to commit any offense defined in Section 841.

## IV.

## BACKGROUND REGARDING ACTIVITIES OF DRUG TRAFFICKERS

10.     Your affiant has learned through training and experience the ways in which narcotics traffickers conduct their business, including methods of distributing narcotics, the use of home-based telephones and the use of cellular telephones, and the use of vehicles to facilitate

their illegal activities. Your affiant's training and experience as a CPD detective and an ATF TFO form the basis of the opinions and conclusions set forth below. Based on your affiant's training, experience, and the experience of other officers, detectives, and agents, your affiant is aware:

    a.   that narcotics traffickers often have firearms on hand and under their control to protect their narcotics and narcotics proceeds.

    b.   that electronic devices are essential to narcotics traffickers. Narcotics traffickers utilize electronic devices to communicate with customers and suppliers. They often send and receive messages discussing prices, amounts, and locations for narcotics deals.

    c.   that narcotics traffickers often place assets in names other than their owner and/or use fictitious identification to avoid detection of these assets by government agencies or local law enforcement;

    d.   that even though these assets are in other persons' names the narcotics traffickers continue to exercise dominion and control;

    e.   that narcotics traffickers must maintain and finance their ongoing narcotics activities, as well as for paying bills, acquiring assets, and making other purchases;

    f.   that it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, bus tickets, rental car receipts, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, purchasing, processing, storage, sale and distribution of drugs, and the collection of its proceeds. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the narcotics traffickers have ready access to them;

    g.   that it is common for narcotics traffickers to secrete contraband, proceeds of drug sales, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value; and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money made from engaging in narcotics trafficking activities in secure locations

within their residences and/or other locations over which they maintain dominion and control, in order to have ready access to them;

h. that it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotic proceeds, such as: currency, financial instruments, precious metals and gem stones, jewelry, books, records, invoices, receipts records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, loan records, money orders, bank drafts, cashier checks, bank checks, wire transfers, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences and/or other locations which they maintain dominion and control;

i. that when drug traffickers amass a large amount of proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits;

j. to accomplish these goals, narcotics traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, Western Union and other wire transfer or Money Service Businesses sales agents, check cashing services, real estate agents, securities brokers, accountants, attorneys, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

k. that narcotics traffickers often utilize electronic equipment such as currency counting machines, telephone answering machines, telephone caller identification boxes, and cellular telephones in their drug activities;

l. that drug traffickers often take or cause to be taken photographs/video tapes of themselves, their associates, their property, and their products. These traffickers usually maintain these photographs/video tapes in their residences and/or other locations in which they maintain dominion or control, including on electronic devices which are used to post such photographs/videos on social media or other websites or applications;

m. that the sale of controlled dangerous substances, generates large quantities of United States currency (aka, street money);

n. that is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

6

o. that the Currency Transaction Report (CTR - IRS Form 4789), which is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

p. that in order to evade the filing of a Currency Transaction Report (CTR), narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

q. that narcotics traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their suppliers, customers, and other associates involved in their narcotics trafficking organization;

r. that drug traffickers commonly have in their possession, that is on their person, at their residences and/or other locations over which they maintain dominion and control, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency; and

s. that courts have recognized unexplained wealth is probative evidence of crimes, in particular, trafficking in narcotics.

## V.

## INVESTIGATION AND PROBABLE CAUSE

A. *Larry ROWE Criminal History*

11. In Franklin County, Ohio Common Pleas Court ROWE has been convicted of attempted possession of drugs, escape, improper handling of a firearm, possession of drugs, and attempted bribery. In US District Court for the Southern District of Ohio ROWE was convicted

7

of possession with intent to distribute (cocaine, cocaine base, heroin, and marijuana), possession with intent to distribute (heroin and marijuana), and possession of one or more firearms. ROWE was sentenced to a total of fifty (50) months of imprisonment. ROWE was released from federal custody on or about August 1, 2018. ROWE is currently under the supervision of the United States Probation Department for the Southern District of Ohio.

B.      *Overview of Criminal Activity*

12.     Through surveillance and other investigatory techniques, investigators know ROWE to use the following addresses in or around Columbus: 1908 Solera Dr., Columbus, Ohio 43229, 3720 Hammerwood Ct., Columbus, Ohio 43219, and 2618 Christine Blvd. Columbus, Ohio 43231. Investigators have observed what they believe through training and experience to be hand to hand drug transactions by ROWE at 1908 Solera Dr. and 3720 Hammerwood Ct. Investigators have observed that ROWE primarily stays overnight at 3720 Hammerwood Ct. ROWE will leave from 3720 Hammerwood Ct. and go to 1908 Solera Dr. where investigators believe ROWE conducts most of his drug trafficking business.

13.     ROWE and Alexis GEORGE have several businesses investigators believe they use to launder ROWE's drug proceeds. Investigators believe 2618 Christine Blvd. to be the primary residence used by GEORGE. Investigators believe this location will be the primary location for records relating to money laundering and fraud.

8

C.      *Narcotics Trafficking*

14.     As part of a separate investigation related to Larry SMITH investigators were conducting surveillance of 1570 Duxberry Ave. Columbus, Ohio. Between August and December of 2020 investigators observed ROWE arrive at 1570 Duxberry Ave several times. As documented in paragraph 50 ROWE was the previous owner of 1570 Duxberry Ave. Columbus Ohio.

15.     On or about December 1, 2020 during surveillance investigators observed SMITH drive his White Tahoe to a location in Columbus Ohio investigators believe to be used for narcotics trafficking. SMITH entered the location. While on surveillance investigators observed a person, hereafter identified as Confidential Source 1 (CS1) exit the residence. A short time later SMITH exited the residence and went to 1570 Duxberry Ave. Shortly after SMITH returned to 1570 Duxberry Ave. investigators observed ROWE arrive and enter into 1570 Duxberry Ave. ROWE left the house with an unknown item in his hands.

16.     A traffic stop was conducted on CS1 after he/she left the home SMITH was seen entering. During the stop investigators found marijuana, crack, and an unknown powdery substance. CS1 agreed to speak with investigators. CS1 described a male inside the location matching SMITH's description who drives a new white Tahoe. CS1 stated SMITH arrived at the location with approximately 4 ounces of fentanyl and several pounds of marijuana.  CS1 stated that SMITH took some of the fentanyl and left the rest. CS1 stated that SMITH left the location right after he/she did.

9

17.     Prior to Larry Smith purchasing 1570 Duxberry from Larry ROWE investigators conducted surveillance at that location in December 2019. During their surveillance they observed ROWE approach the driver of a white Ford Escape parked in front of 1570 Duxberry. After speaking with the driver of the Escape ROWE and the driver enter 1570 Duxberry. The driver exits 1570 Duxberry and returns to his vehicle a short time later. When the driver of the Ford Escape exits Duxberry he is observed carrying a white box. After driving away from Duxberry a traffic stop is conducted by a marked Columbus Division of Police (CPD) unit on the Escape after several moving violations are observed. Upon approach the officer smelled raw marijuana. During a search of the vehicle the officer found approximately 213 grams of marijuana in a white box on the vehicles front passenger seat.

18.     On or about January 28, 2021 a search warrant was executed at 1570 Duxberry Ave. Columbus, Ohio. At this time Larry Smith was the listed owner of the home. During the search investigators found over three hundred (300) grams of fentanyl, a stolen firearm, cocaine, and marijuana.

19.     Investigators recovered three (3) phones from the search warrants executed on or about January 28, 2021. The investigation has indicated that (614) 592-8283 number likely belongs to ROWE, as he listed it in a Columbus Division of Police report in 2018; in addition, a letter from the Ohio Department of Job and Family Services dated January 22, 2021, shows ROWE used the number on his initial application for Pandemic Unemployment Assistance (PUA). Upon review of the phone at issue, investigators documented texts from Smith to and

10

from ROWE for the period of September 3, 2020, to January 25, 2021, the time period relevant to Smith and ROWE's suspected drug-trafficking activities.

20.     On or about September 9, 2020 SMITH sends a text message to (614) 592-8283 listed as "Bliz" in SMITH's contacts. The messages states "each one of the stacks short 100". Bliz replies "bro on my kids I'm done doing business with you all together on my dead mom I count ever one of them".

21.     On or about October 6, 2020 a photo is texted from Bliz to SMITH. The photo shows what appears to be a prescription cough syrup bottle with the label ripped off in a freezer. A follow up text from Bliz states "hope this don't freeze got drink already". Investigators are aware that "drink" is slang used to refer to prescription cough syrup mixed with soda or alcohol. It is also called "purple drink" or "purp" due to the color of the liquid after it is mixed. Promethazine Codeine cough syrup is a schedule 4 narcotic.

22.     On or about November 30, 2020 a text message from Bliz states "I got some weed now".

23.     On or about January 5, 2021 "Bliz" send a message with a photo of a prescription bottle.  A partial view of the label shows it is prescribed to -Howard, Sam and contains zine-codeine.

24.     On or about January 8, 2020 Bliz send a message to SMITH that states "give couple days to see if it cook up but right now this ain't it". BLIZ send SMITH a photo of a package of commercial marijuana.

11

25.     Investigators are aware that ROWE primarily drives a black Chevrolet Impala Ohio license plate JFL3659. Investigators have observed ROWE driving this vehicle on multiple occasions as documented later in this affidavit. Investigators know this Impala to be registered to Alexis GEORGE. George was issued a title for the Impala on or about September 14, 2020. It was purchased from Larry SMITH for the listed sale price of $500.00. SMITH was previously issued a title for the Impala on or about August 13, 2020. SMITH purchased it for the listed price of $6,000.00.

26.     On or about September 9, 2020 Bliz sends a text message to SMITH that states "bro she gonna be ready in the morning to notarize it and bring the money out with me first thing in the morning".

27.     On or about September 10, 2020 SMITH's signature was notarized on the title to sell the Impala to GEORGE.

28.     On or about September 10, 2020 Bliz sends SMITH a text message with a screen shot of a vehicle value according to the Kelley Blue Book. The screen shot does not show the vehicle in question only that the vehicle is valued at $6,867 to $8,660.

29.     GEORGE's purchase of the vehicle from SMITH for $5,500.00 less than SMITH purchased it for approximately one month prior is believed to be an attempt to avoid paying the appropriate sales taxes. This fraudulent activity is later repeated during the sale of 1570 Duxberry Ave. to SMITH by ROWE.

12

30.    On or about February 25, 2021 during surveillance investigators observed the black Chevrolet Impala Ohio license plate JFL3659 parked in front of 1908 Solera Dr.

31.    Investigators observed an unknown male park a tan Ford Fusion in front of the 1908 Solera Dr. The male walked inside of 1908 Solera Dr. Less than five minutes later the male walked out of 1908 Solera Dr. and entered the driver's seat of the tan Ford Fusion. The Ford Fusion registers to Martez JACKSON. JACKSON has a prior conviction in Franklin County Ohio Common Pleas Court for felony possession of drugs.

32.    Investigators followed the Ford Fusion to a Sunoco Gas Station located at Karl Rd and Schrock Rd. While the vehicle was parked at the gas pumps investigators observed an unknown female approached the vehicle and conduct a hand-to-hand narcotics transaction with the unknown male.

33.    On or about March 4, 2021, during surveillance, investigators observed the black Chevrolet Impala parked in front of 1908 Solera Dr. ROWE was then observed leaving the residence with a small black bag. ROWE entered the driver's side of the Chevrolet Impala and drove to the other side of the apartment complex. ROWE exited the Chevrolet Impala and approached a Cadillac Escalade. ROWE was then observed conducting what law enforcement believed, based upon training and experience, to be a hand-to-hand narcotics transaction with an unknown occupant of the Cadillac.

34.    ROWE then drove away in his vehicle. ROWE was then followed by investigators to a residence in Columbus, Ohio, where he was met by individuals matching the

13

descriptions of Michael Lanier and Levar Douglas. Douglas has two prior convictions in Franklin County for possession of narcotics. ROWE, Lanier, and Douglas were then observed exiting the residence at the same time. Douglas was observed carrying a white bag, a cup, and a box of latex gloves. Investigators know from training and experience that narcotics traffickers often use latex gloves when handling dangerous narcotics to avoid accidental exposures. ROWE and one of the males returned to 1908 Solera Dr.

35.     On or about March 4, 2021 during surveillance investigators observe a Volvo park near 1908 Solera Dr. ROWE exit the residence and conduct a hand-to-hand narcotics transaction with an unknown person inside of the Volvo. ROWE then enters 1908 Solera Dr., and the Volvo leaves the area.

36.     On or about March 19, 2021 during surveillance investigators observe ROWE and an unknown male exit 1908 Solera Dr. They approached two vehicles that were occupied and running. ROWE and the unknown male speak to and have short interactions with the drivers of the two vehicles. After the interaction ROWE and the male returned to 1908 Solera Dr.

37.     On or about March 25, 2021 during surveillance investigators observe a gray Honda park in front of 1908 Solera Dr. ROWE exits 1908 Solera Dr. ROWE approaches the driver's side of the grey Honda. ROWE conducts what appears to be a hand-to-hand drug transaction with the driver.

14

38.     A short time later a BMW parks in front of 1908 Solera Dr. An unknown male exits the BMW and enters 1908 Solera Dr. The male was observed carrying a black Nike bag. The male leaves 1908 Solera Dr. approximately 30 mins after he entered.

39.     On or about March 31, 2021 during surveillance investigators observe Bobby Summerall and ROWE exit 1908 Solera Dr. Summerall has prior arrests for narcotics and firearm offenses. ROWE leaves in the black Impala.

40.     On or about April 1, 2021 during surveillance investigators observe ROWE arrive at 1908 Solera Dr. in the black Impala. ROWE enters 1908 Solera Dr. using a key. After ROWE arrives a gold van parks in front of 1908 Solera Dr. ROWE approaches the passenger side of the vehicle. After a short interaction ROWE goes inside of 1908 Solera Dr.

41.     On or about April 10, 2021 during surveillance investigators observe ROWE's black Impala arrive at and park in front of 1908 Solera Dr. Investigators observe ROWE exit the drivers seat of the Impala. Investigators observe a bottle of promethazine cough syrup fall out of the grocery bag ROWE is carrying. Two more bottles of promethazine are observed in the bag. ROWE entered 1908 Solera Dr. using a key.

42.     On or about April 16, 2021 during surveillance investigators observe ROWE's black Impala parked in front of 1908 Solera Dr. Investigators observed Martez JACKSON park a Ford Fusion in front of 1908 Solera Dr. JACKSON enters 1908 Solera Dr. Investigators observe a Honda Accord park near 1908 Solera Dr. A male and female exit the Honda and enter 1908 Solera Dr. Both are inside for a few minutes then leave together.

15

43.     On or about April 16, 2021 during surveillance investigators observe ROWE's black Impala parked in front of 1908 Solera Dr. Investigators observe a marron van park near the location. An unknown male exits the van and is met in front of the 1908 Solera Dr. by ROWE. ROWE and the male walk to ROWE's Impala. After a brief interaction ROWE returns to 1908 Solera Dr. and the male leaves in the van.

D.     *Fraud Activities*

44.     On or about September 1, 2018 Alexis GEORGE filed Domestic for Profit LLC-Articles of Organization paperwork with the Ohio Secretary of State's office for a business named ROWE Foundation LLC. On or about October 4, 2019 Rowe Foundation LLC filed Domestic for Profit LLC-Articles of Organization paperwork with the Ohio Secretary of State's Office for a business named Buckeye One Stop Shop LLC naming Alexis George the statutory agent.

45.     Investigators believe that Larry ROWE and Alexis GEORGE have either a business arrangement or partnership, as Alexis GEORGE is the statutory agent for the Rowe Foundation and Buckeye One Stop Shop LLC.  Records obtained through the Small Business Administration indicate that Larry ROWE claimed to have 100% ownership of both LLCs. Alexis GEORGE and Larry ROWE are both authorized signors on a Chase bank account titled Rowe Foundation LLC.  Alexis George was listed as an authorized user on two credit cards where Larry ROWE was the name on the accounts.  Both Larry ROWE and Alexis GEORGE have used the address of 2618 Christine Blvd., Columbus, Ohio 43231, for various financial

16

accounts in their names. The address, business, and financial connections indicate a business arrangement or partnership connection between Larry ROWE and Alexis GEORGE.

46. On or about February 25, 2019 during a meeting with his probation officer ROWE was asked how he was supporting himself and purchasing and remodeling homes. ROWE responded that the funding came from old drug money that was not located when he was previously arrested on federal narcotics charges.

47. ROWE's probation officer stated that ROWE does not have any current employment listed. After being placed on home restrictions ROWE submitted paperwork that he would be an Uber driver. To the probation officer's knowledge ROWE never worked for Uber. Investigators believe that ROWE told the court he was employed as a driver in an attempt to have the court remove restrictions on when he is permitted to be outside of his residence.

48. ROWE told his probation officer that Alexis GEORGE is the owner of the Rowe Foundation and everything belongs to her and is in her name. ROWE described her as a good friend. ROWE stated the Rowe Foundation owns rental properties but due to the pandemic, people are not paying rent.

49. ROWE has left the country on vacation at least twice. ROWE went to the Virgin Islands in March of 2021. During 2020 ROWE took a vacation to Puerto Rico. ROWE did not receive permission for either trip from his probation officer.

50. On or about June 21, 2019 the Rowe Foundation LCC purchased 1570 Duxberry Ave. Columbus, Ohio for the listed sale price of $5,000.00. On or about June 24, 2020 Larry

17

SMITH purchased 1570 Duxberry Ave. for the listed sale price of $15,000.00. As with the prior

sale of the Impala to GEORGE from SMITH investigators believe the property was purchased

for thousands of dollars less than what it was worth to avoid paying conveyance tax and to

disguise the true purchase price in an attempt to reduce any law enforcement scrutiny relating to

the property transfer. On or about October 21, 2020 SMITH listed 1570 Duxberry Ave. for sale.

The listed sale price was $119,900.00. Investigators viewed the home listing and photos online.

The home was listed as having been totally rehabbed. The home was listed as having new

windows, roof, siding and HVAC system. Investigators believe that the improvements to 1570

Duxberry Ave. were made prior to the sale of the home to Smith. At no time during surveillance

of the home during SMITH's ownership did investigators observe any activity at the home

consistent with home improvement. The home went into contract on or about January 30, 2021

and was later sold for the sale price of $108,000.00.

51.    On or about February 11, 2019, the Rowe Foundation LLC received the property

located at 1419 Nineteenth Avenue, Columbus, Ohio for a recorded transfer price of zero dollars

from Alexis George. The Franklin County Auditor's website showed Alexis George purchased

the property on December 5, 2018 for $20,000. Investigators believe the property has been

rehabbed. The Franklin County Auditor's 2020 appraised value for the property is $70,300. An

internet search conducted on February 23, 2021 found on the website Zillow that the property

allegedly sold on February 16, 2021 for $163,900. A warranty deed for the transfer of the

18

property was recorded on March 24, 2021 and the Franklin County Auditor's website showed the transfer date and price as March 24, 2021 for $163,900.



52.     On or about November 7, 2019, a deed was recorded for the Rowe Foundation LLC purchase of the property located at 1511 Twenty Sixth Avenue, Columbus, Ohio for a recorded purchase price of $15,500. Investigators believe the property has been rehabbed. An internet search conducted on February 23, 2021 found on the website Zillow that Zillow's estimated value for the property was $97,434.

19



53.     On or about December 9, 2019, the Rowe Foundation LLC purchased the

property located at 2317 Grasmere Avenue, Columbus, Ohio for a recorded purchase price of

$10,000.  Investigators believe the property has been rehabbed.  An internet search conducted on

February 23, 2021 found on the website Zillow that Zillow's estimated value for the property

was $73,174.



54.     Records from the Ohio Department of Taxation dated March 8, 2021, related to ROWE and any associated businesses showed no personal tax returns had been filed for years 2015 thru 2019 or any business taxes for 2015 thru 2021. Similarly, GEORGE had filed no personal returns for 2016 and 2018 or any business taxes for 2015 thru 2021. GEORGE did file 2015, 2017, and 2019 personal tax returns that listed Federal Adjusted Gross Income (AGI) of $15,095, $19,504 and $14,740.00; respectively. For 2019 GEORGE listed Nurses Heart Medical Staffing as her primary income.

21

55. Records from the Ohio Department of Taxation show that the following entities associated with ROWE and/or Alexis GEORGE: Buckeye One Stop Shop LLC, Guardian Angel Home Health LLC, National Medical Billing LLC, Rowe Foundation LLC, and Lexy Loo's LLC have not filed any business taxes from 2015-2021.

56. A review of Ohio Department of Job and Family Services Office of Unemployment Insurance Operation records indicated that ROWE received Pandemic Unemployment Assistance (PUA) payments. The records showed for the period May 21, 2020 to September 28, 2020 that he received $13,929 in payments. ROWE listed his occupation as passenger vehicle driver. ROWE listed that he had done that type of work for one (1) year. ROWE listed his last date worked as April 4, 2020. ROWE stated that he was unable to reach the place of employment because he had been advised by a health care provider to self-quarantine due to concerns related to COVID-19. Further ROWE answered that his hours had been reduced to less than ten (10) hours in a two (2) week span. During surveillance of ROWE, the investigation has not observed ROWE working as a passenger vehicle driver. Nor have investigators observed any deposits in ROWE's bank accounts consistent with working as a driver.

57. On or about April 30, 2021 ROWE told his probation officer that he had not worked for Uber in over two years.

58. A review of records received from the Small Business Administration showed that Rowe Foundation LLC, Buckeye One Stop Shop LLC, National Ambulance & Medical

22

Billing LLC, and Guardian Angel Home health LLC submitted applications for economic injury disaster loans. The contact name for Rowe Foundation LLC and Buckeye One Stop Shop LLC was ROWE listed as 100 percent ownership. The contact name for National Ambulance & Medical Billing LLC and Guardian Angel Home Health LLC was GEORGE listed at 100% ownership. The loans appeared denied but Rowe Foundation LLC received a $10,000 advance. The Rowe Foundation LLC claimed gross revenue of $100,000 with cost of goods listed at $10,000 and $5,000 rental losses due to the disaster.

59. Records from the federal Small Business Administration for Buckeye One Stop Shop LLC application for economic injury disaster loan show that Buckeye One Stop Shop had a gross revenue of $120,000.00 with a cost of goods listed at $20,000.00. The business address listed is 2222 Summit St. Columbus, Ohio 43201. On the Articles of Incorporation for Buckeye One Stop Shop LLC local convenient and grocery store including Ohio State gear is listed under purpose.

60. On or about March 17, 2021 during the afternoon hours investigators went to 2222 Summit St. Columbus, Ohio 43201. The business was closed with the roll down security screen in place over the windows and doors. Posted on the outside of Buckeye One Stop Shop was an eviction notice from the city of Columbus dated March 15, 2021 to the Rowe Foundation. Also posted on the outside of the business was a notice to ROWE, GEORGE and the Rowe Foundation from Wael Hussein who was listed as the landlord. The notice was dated January 26, 2021 and stated that they must pay the sum of $3250.00 in three days or vacate the premises.

23

Investigators believe that the while the Rowe Foundation had rented 2222 Summit St. it had never operated as a convenient and grocery store.

61.     A review of subpoenaed records received from Coinbase on April 29, 2021 reflect that ROWE sold approximately $149,902 in Bitcoins from 2019 to present.

62.     A review of ROWE's Huntington National Bank checking account ending in 6567 showed cash deposits during the period of June 2018 thru September 9, 2019 totaling $31,312.  Your affiant is aware, from training and experience, that narcotics traffickers tend to prefer and utilize cash currency as part of their drug-trafficking activities.  Additionally, between the periods of April 2019 thru August 2, 2019 there were Zelle Transfers and Coinbase deposits totaling $2,514.87.

63.     A review of ROWE's Kemba Financial Credit Union checking and savings accounts ending in 4681-80 and 4681-00; respectively showed teller deposits during the period of June 2019 thru December 2020 totaling $38103, wire deposits totaling $39,311.16 and Cash APP deposits totaling $5,494.32.

64.     A review of bank statements for ROWE's J.P. Morgan Chase Bank account ending in 3366 for the period of June 19, 2018 to December 16, 2019 showed cash deposits totaling $63,589 and for the period March 11, 2020 to January 29, 2021 cash deposits totaled $27,454 for a total of $91,043 in cash deposits.  Additionally, during the period of March 2, 2020 to February 9, 2021 there were $34,311.60 in deposits from Coinbase.  A review of Rowe Foundation LLC's J.P. Morgan Chase Bank account ending in 1060 for the period of October 17,

2018 to November 29, 2019 showed cash deposits totaling $21,393 and for the period March 19, 2020 to October 21, 2020 cash deposits totaled $6,098 for a total of $27,491 in cash deposits. Additionally, during the period March 30, 2020 to February 9, 2021 there were $10,105.73 in Coinbase deposits.

65.    A review of records related to Discover Card accounts in the name of ROWE showed payments totaling $33,499.91 were made during the period of July 2, 2018 to December 2, 2019. ROWE was listed as primary for the account and GEORGE was listed as authorized.

66.    A review of Credit One Bank credit card statements for ROWE showed payments totaling $8,463.60 during the period January 3, 2019 and December 15, 2019.

67.    A review of Capital One credit card statements for ROWE showed payments totaling $14,584.80 during the period September 24, 2017 and July 13, 2019. ROWE was listed as primary for the account and GEORGE was listed as authorized.

68.    A review of Genesis FS Card Services credit card statements for ROWE showed payments totaling $1,331.14 during the period December 2018 and May 2019.

69.    The investigation has indicated a likelihood that ROWE purchased his first property using narcotics proceeds. In addition, at the time of purchase, he had no discernable source of income. Based upon the investigation, the circumstances indicate that ROWE likely then used narcotics proceeds to rehab and improve the property. He then sold the property for a profit. The investigation indicates that any profit from the initial sale was then made to look like legitimate money. The investigation has further indicated that, regarding a number of the

properties indicated in this affidavit, there were building permits obtained related to the potential improvements regarding the properties. The investigation has indicated that ROWE has continued the cycle of laundering narcotics proceeds through property purchases, improvements, and sales. That is, the lack of any apparent job or work, the lack of state tax filings, the observed hand-to-hand narcotics transactions, the records showing a large amount of cash deposits in multiple bank accounts, the misrepresentation of his work as a passenger vehicle driver on the PUA application, as well as the property purchases, all support investigators' belief that ROWE is laundering narcotics proceeds through property purchases and sales.

D.   *Links to 3720 Hammerwood Ct.*

70.     On or about February 24, 2021 during surveillance investigators observed Rowe park in front of the PREMISES and enter the front door of using a key. Rowe was then observed leaving the apartment and driving to a Sunoco Gas Station located at Stelzer Rd and Agler Rd. At the gas station Rowe made contact with an unknown male. The unknown male entered the passenger seat of Rowe's vehicle and left after a short period of time. The unknown male then entered a vehicle bearing Texas license plate MKB8304. A record check of Texas plate MKB8304 showed that the vehicle had been rented by Mark Langford. The male observed matched Langford's description. Langford has prior arrests for narcotics offenses.

71.     On or about May 1, 2021 during surveillance investigators observe the Impala pull out of the garage attached to the PREMEISES. ROWE is observed driving the Impala.

26

ROWE drives directly to Chase Bank. After leaving the bank ROWE drives to 1908 Solera dr. and enters using a key.

72.      Using electronic surveillance investigators were able to document the black Chevrolet Impala utilized by ROWE at the PREMISES 66 times between April 2, 2021 and April 21, 2021.

73.      A review of the lease application for the PREMISES shows that the PREMISES is rented by Jennifer Starcher. Starcher lists a minor named Larry ROWE as a resident in the PREMISES. Investigators believe that Starcher is the mother of ROWE's child. Starcher listed her prior residence as 1419 E 19 Ave. Columbus, Ohio 43211. Starcher listed GEORGE as the manager / contact from her prior residence.  Starcher has paid her rent with a credit card that used the address of 2618 Christine Blvd. Columbus, Ohio.

## VI.

### TECHNICAL TERMS

74.      Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## VII.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

75.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

76.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or

years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

29

e.  Based on actual inspection of other evidence related to this investigation, PUA applications, financial records, and articles of incorporation.  I am aware that computer equipment was used to generate, store, and print documents used in the money laundering and drug trafficking scheme.  There is reason to believe that there is a computer system currently located on the PREMISES.

65.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

f.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the

30

attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

g.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.

31

For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating

32

criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

h.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

i.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

j.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence

33

of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

66.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the

warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

67.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted

35

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## IIX.

## CONCLUSION

68.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Samuel Chappell
**Task Force Officer**
**Alcohol, Tobacco, and Firearms**

Subscribed and sworn to before me
on May 18, 2021:

**CHELSEY M. VASCURA**
**UNITED STATES MAGISTRATE JUDGE**

## ATTACHMENT A

### *Property to be searched*

The property to be searched is 3720 HAMMERWOOD Ct., COLUMBUS OHIO, 43219, further described as two-story apartment with an attached garage. The numbers 3720 are clearly marked to the left of the garage door. The exterior of the apartment has brick and white siding.





## ATTACHMENT B

### *Property to be seized*

1.      All records relating to violations of 18 U.S.C. § 1031. Major fraud against the United States  18 U.S.C. § 1956 (a)(1)(A)(I) (Laundering of monetary instruments with the intent to promote the carrying on of the specified unlawful activity) 18 U.S.C. § 1956 (a)(1)(B)(i)(Laundering of monetary instruments with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity)  and 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance), those violations involving Larry ROWE, Alexis GEORGE, Rowe Foundation LLC, and Buckeye One Stop Shop LLC.

2.      Illicit narcotics and narcotics trafficking paraphernalia to include scales, blenders and narcotics packaging materials

3.      Firearms, firearm parts, and accessories.

4.      United States currency, precious metals, jewelry, and financial instruments, as well as books and records regarding the acquisition, use and disposition of such items of value;

5.      Safe deposit box lease agreements and safe deposit keys;

6.      Proof of residency, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys.

7.     Any safes, vaults, or secured storage equipment that could secret any of the above listed items, and the contents therein and the ability to use force to open them.

8.     Computers or storage media used as a means to commit the violations described above.

9.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

c.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

d.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

2

e.  evidence of counter-forensic programs (and associated data) that are designed to
    eliminate data from the COMPUTER;

f.  evidence of the times the COMPUTER was used;

g.  passwords, encryption keys, and other access devices that may be necessary to
    access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or
    to conduct a forensic examination of the COMPUTER;

i.  records of or information about Internet Protocol addresses used by the
    COMPUTER;

j.  records of or information about the COMPUTER's Internet activity, including
    firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"
    web pages, search terms that the user entered into any Internet search engine, and
    records of user-typed web addresses;

k.  contextual information necessary to understand the evidence described in this
    attachment.

3